## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Laura Smith, being duly sworn, state as follows:

### AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office. I joined the FBI in 2010 as a forensic accountant conducting complex financial investigations; I am currently a special agent on a squad that investigates economic crimes, including various forms of corporate fraud, securities fraud and bribery. I hold a Bachelor's degree in Criminal Justice-Economic Crimes Investigation and a Master's degree in Accounting. As an FBI Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I make this affidavit in support of a criminal complaint charging the defendant MICHAEL CENTER with conspiracy to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349.

3. The facts set forth in this affidavit come from my personal involvement with this investigation, interviews with witnesses, including the cooperating witnesses described below, and my review of documents, bank records, emails and other materials obtained through search warrants, Court-authorized Title III wiretap recordings, consensual recordings, and information provided by other law enforcement agents.

4. In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause.

## PROBABLE CAUSE

### Certain Relevant Persons and Entities

5. CENTER, a resident of Austin, Texas, is the head coach of the men's tennis team at the University of Texas at Austin ("U-Texas").

6. U-Texas is a highly selective public university located in Austin, Texas. The U-Texas men's tennis team competes at the Division I level of the National Collegiate Athletic Association ("NCAA"), and is consistently ranked as one of the top tennis teams in the nation. Like many universities, U-Texas recruits student athletes, who are admitted to the university through a separate admissions process. As part of that separate admissions process, coaches of varsity sports provide admissions officers with a list of their designated recruits, and the admissions office, in turn, reviews the applicants. Typically, admissions officers are deferential to the coaches' judgment about applicants' athletic abilities. The admissions prospects of recruited athletes are significantly higher than those of non-recruited athletes with similar grades and test scores, particularly applicants who do not live in Texas.

7. The Edge College & Career Network, LLC, also known as "The Key," is a for-profit college counseling and preparation business in Newport Beach, California, founded in or about 2007 and incorporated in the State of California in or about 2012.

8. The Key Worldwide Foundation ("KWF") is a non-profit corporation founded in or about 2012 and based in Newport Beach, California. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax. KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

9. Cooperating Witness 1 ("CW-1") is an individual who participated in the conspiracy set forth here. CW-1 founded and, together with others, operated The Key and KWF.[1]

## The College Recruitment Scheme

10. CW-1 has admitted to law enforcement agents that between the years of approximately 2011 through 2018, clients paid him approximately $25 million—mainly funneled through the KWF charitable accounts—to bribe coaches and university administrators at elite universities nationwide. In exchange for the bribes, the coaches and administrators agreed to designate the children of these clients as recruited athletes, or some other preferred category,[2] thereby facilitating the children's admission to the universities.

11. CW-1 has told investigators that in or about 2015, CENTER agreed to accept approximately $100,000 from CW-1 as a bribe, in exchange for which CENTER would designate a student ("Applicant 1") as a recruit to the U-Texas tennis team, thereby facilitating his admission to U-Texas. Applicant 1, a resident of Los Altos Hills, California, did not play competitive tennis.

---

[1] CW-1 has agreed to plead guilty in the United States District Court for the District of Massachusetts to an Information charging him with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d); money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371, and obstruction of justice, in violation of Title 18, United States Code, Section 1512(c). CW-1 has been cooperating with the government's investigation since in or about late September 2018, in the hope of obtaining leniency when he is sentenced. In or about October 2018, after he began cooperating with the government, CW-1 alerted several subjects of the investigation to its existence, resulting in the obstruction of justice charge to which he has agreed to plead guilty. Information CW-1 has provided has been corroborated by, among other things, Court-authorized wiretaps, emails, documents, consensual recordings, and interviews of other witnesses, including cooperating witnesses.

[2] Other preferred categories include categories such as a "VIP" list.

According to CW-1, the bribe was arranged by a third party, Martin Fox, of Houston, Texas, who was acquainted with both CENTER and CW-1, and introduced them to one another.[3]

12.   Documents I have reviewed indicate that Applicant 1 was not a competitive tennis player. Applicant 1's application for admission to U-Texas listed him as a manager of his high school basketball and football teams. The only tennis referenced in his application was one year of tennis as a high school freshman.

13.   On or about November 23, 2014, CW-1 emailed Applicant 1's high school transcript and application essays to Fox. On or about November 25, 2014, Fox forwarded the email to CENTER. CENTER replied to Fox with the message, "Got it." Later that day, CENTER emailed Fox again, noting, "I read his application and researched his high school … [l]ooks like he goes to very high end school." CENTER directed Fox to call him "after [T]hanksgiving" so they could "discuss."

14.   On or about December 11, 2014, CENTER emailed Applicant 1's application materials to an administrator in the U-Texas athletics department so that Applicant 1 would be coded as a student-athlete.

15.   On or about February 27, 2015, Applicant 1's father made a purported donation of stock valued at $455,194 to KWF.

16.   On or about March 2, 2015, CENTER emailed Applicant 1's father and notified him that U-Texas would be sending Applicant 1 a letter of intent for a "books" scholarship, pursuant to which the university pays for an athlete's books, as part of the recruitment process.

---

[3] Fox has been separately indicted by a Grand Jury in the District of Massachusetts on a charge of conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d), in connection with his role in the scheme described here.

17. In a letter dated April 13, 2015, U-Texas awarded Applicant 1 the books scholarship, and on or about April 15, 2015, Applicant 1 and his father returned via email from California a signed "letter of intent" to play tennis for U-Texas. Applicant 1 was then added to the U-Texas tennis team roster as a recruited athlete.

18. On or about April 22, 2015, an employee of CW-1, acting at CW-1's direction, purchased a cashier's check for $25,000, payable to "Texas Athletics," using KWF funds.

19. On or about April 30, 2015, Applicant 1's father made a second purported donation of stock to KWF, this time with a value of $102,925. On or about May 12, 2015, he made a third purported donation of stock to KWF, with a value of $73,445.

20. On or about June 8, 2015, CW-1's employee, acting at CW-1's direction, mailed Fox a check for $100,000, drawn on one of the KWF charitable accounts, for his role in brokering the bribe of CENTER.

21. On or around June 5, 2015, KWF mailed CENTER a $15,000 check, payable to "Texas Athletics Attn: Michael Center."

22. CW-1 has advised investigators that, in or about June 2015, he flew to Austin, Texas and met with CENTER in a hotel parking lot. CW-1 stated that he gave CENTER approximately $60,000 in cash.

23. Flight records confirm that on or about June 22, 2015, CW-1 flew from San Francisco, California to Austin, Texas, arriving at approximately 11:16 p.m. CW-1 flew from Austin to Los Angeles, California approximately six hours later, at 5:30 a.m. the following morning. Bank records indicate that, in May and June 2015, prior to the Austin trip, CW-1 withdrew approximately $60,000 in cash from his account in six separate withdrawals.

24. CENTER's bank account records indicate that between on or about January 20, 2015 and on or about June 22, 2015, CENTER did not make a single cash deposit into his bank account. On or about June 23, 2015, however—the day CW-1 met with CENTER—CENTER deposited $440 in cash into his account. Three days later, CENTER deposited another $240 in cash into his account. In July 2015, CENTER deposited $3,945 in cash. In August 2015, CENTER deposited $5,220 in cash. And in September 2015, CENTER deposited another $2,960 in cash.

25. On or about September 4, 2015, around the time Applicant 1 started classes at U-Texas, Applicant 1 voluntarily withdrew from the tennis team and renounced his "books" scholarship, meaning that he decided to no longer receive money from U-Texas to purchase his school books and he no longer would be classified as a student-athlete.

26. On or about October 5, 2018, CW-1 called CENTER at the direction of law enforcement agents. During the call, CENTER and CW-1 discussed the bribe that had been paid for Applicant 1. CENTER confirmed that he had signed Applicant 1 to a books scholarship to secure his admission to U-Texas and that he was paid more than $90,000 ("in the nineties") in exchange for recruiting Applicant 1. The following are two excerpts from the call, which was consensually recorded.

| | |
|---|---|
| CW-1 | .... I was calling you – I'm in Boston right now. |
| CENTER | Ok. |
| CW-1 | But I was calling you, because I have a kid for potentially next year. He's a 2-3 star, so obviously he's not at the level of you guys. |
| CENTER | Yeah. |
| CW-1 | And I was hoping that maybe we could, kinda, do what we did last time. I'm not sure exactly what we actually did, but whatever that is, if we could do something like that, that would be fabulous. Do you remember what we did? |

| | |
|---|---|
| CENTER | Yeah, I mean I signed him to "books." |
| CW-1 | Yeah. Ok. |
| CENTER | And I got him in the school, you know, and then he -- then he withdrew from the team. I mean, does this kid wanna be on the team or does this kid just wanna get into school? |
| CW-1 | ... I think probably he could go either way. |
| CENTER | Ok. |
| CW-1 | ... he doesn't need to be on the team to be frank. |
| CENTER | Ok. |
| CW-1 | But he can be, and he doesn't need the scholarship, so he can withdraw the scholarship, right? You know, when school starts if you want that. |

* * *

| | |
|---|---|
| CW-1 | So, yeah, I mean, kinda think about what we did financially [for Applicant 1]. |
| CENTER | Ok. |
| CW-1 | 'Cause I wanna make sure that that works for you as well again. |
| CENTER | Yeah. Ok. |
| CW-1 | I remember that we met and, you know, part -- some of the money was gonna go towards your -- was it your son's bar mitzvah? |
| CENTER | Well, no. Well, we -- I put some money in towards that facility, to be honest with you. |
| CW-1 | Ok. Ok. |
| CENTER | You sent me a couple checks that I put towards the facility. |
| CW-1 | Right. Great. |
| CENTER | And then I -- and then -- and then you came to Austin that one time. |
| CW-1 | Right. |

| | |
|---|---|
| CENTER | So I think -- I think the total amount was, you know, in the nineties area, if I remember correctly. Yeah. |
| CW-1 | Got it. Well you -- you let me know whatever that number is. |
| CENTER | Ok. |
| CW-1 | And think about it, and-- |
| CENTER | Ok. Let me see what I can do. It's a little -- I gotta -- it's a little tight on because -- you know, just even these book scholarships are ... you know what I need to do, is just, if you could start with ... maybe just email me or send me the kid's name, and-- |
| CW-1 | Info and all that. |
| CENTER | Or maybe -- yeah, yeah. |
| CW-1 | Let me do that. I'll do that. |

## CONCLUSION

Based on my knowledge, training and experience and the facts set forth in this affidavit, I have probable cause to believe and I do believe that CENTER conspired with others known and unknown to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Section 1349.

Respectfully submitted,

Laura Smith
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on March 6, 2019

The Honorable M. Page Kelley
United States Magistrate Judge